
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Name: | Docket or Case No.: |
| Charles Alan Dyer | CIV-16-941 C |
| Place of Confinement: Lexington Assessment and Reception Center, Lexington, OK. | Prisoner No.: 659682 |

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| CHARLES ALAN DYER | v. JIM FARRIS (Warden) |

The Attorney General of the State of:Oklahoma

## PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   Stephens County District Court, Duncan, Oklahoma
   (b) Criminal docket or case number: CF-2010-17

2. (a) Date of judgment of conviction: April 19, 2012
   (b) Date of Sentencing: June 5, 2012

3. Length of sentence: 30 years imprisonment

4. In this case, were you convicted on more than one count or more than one crime? ☐ Yes  ☒ No

5. Identify all crimes of which you were convicted and sentenced in this case: 21 O.S. 843.5 (E)

6. (a) What was your plea?

   ☒ (1) Not guilty     ☐ (3) Nolo Contendere

   ☐ (2) Guilty         ☐ (4) Insanity plea

   (b) If you entered a guilty plea to one count or charge and not guilty to another count or charge, what did you plead guilty to and what did you plead not guilty to? Not Applicable
   (c) If you went to trial, what kind of trial did you have?

☒ Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

 ☒ Yes ☐ No

8. Did you appeal from the judgment of conviction?

 ☒ Yes ☐ No

9. If you did appeal, answer the following:

 (a) Name of court: <u>Oklahoma Court of Criminal Appeals</u>

 (b) Docket or case number: <u>No. F-2012-506</u>

 (c) Result: <u>Judgment and sentence affirmed</u>

 (d) Date of result: <u>October 30, 2013</u>

 (e) Citation to the case: <u>Not publicized</u>

 (f) Grounds raised: <u>**Ground 1**: Ineffective assistance of trial counsel</u>
 <u>**Ground 2**: Improper admission of character evidence</u>
 <u>**Ground 3**: Trial court erred in refusing to permit an expert witness to testify for the defense</u>

 (g) Did you seek further review by a higher state court? ☐ Yes ☒ No

 (h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☒ No

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? ☒ Yes ☐ No

11. If your answer to Question 10 was "Yes", give the following information:

 (a) (1) Name of Court: <u>Stephens County District Court</u>

 (2) Docket or case number: <u>CF-2010-17</u>

 (3) Date of filing: <u>April 24, 2014</u>

 (4) Nature of the proceeding: <u>Post-conviction proceedings under 22 O.S. §1080</u>

 (5) Grounds raised: <u>**Ground 1**: Ineffective assistance of appellate counsel</u>

 (6) Did you receive a hearing where evidence was given on your petition, application, or motion?
 ☐ Yes ☒ No

 (7) Result: <u>Application denied by Order of Summary Disposition</u>

 (8) Date of result: <u>October 22, 2014</u>

 (b) If you filed any second petition, application, or motion, give the same information: <u>Not Applicable</u>

 (c) If you filed any third petition, application, or motion, give the same information: <u>Not applicable</u>

 (d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

 ☒ Yes ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not: <u>Not Applicable</u>

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State facts supporting each ground.

GROUND ONE: <u>INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL</u>

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim):

<u>FACT: Petitioner was denied effective assistance of counsel on direct appeal in violation of the 6th and 14th Amendment (See supporting brief at pgs.1-6 for argument and citation.</u>

i.   <u>Petitioner's court appointed indigent direct appeal counsel prepared and filed Petitioner's Direct Appeal in the OCCA asserting the following propositions of error:</u>

  (1) <u>Ineffective assistance of trial counsel</u>

  (2) <u>The court erred in not allowing Dr. Hand from testifying for the defense</u>

  (3) <u>The court erred in allowing improper bad acts character evidence</u>

<u>And omitted the obvious, from the record, clearly meritorious claims presented in this application (presented as IAAC sub claims)</u>

ii.   <u>In summary opinion on Oct. 30, 2013, the OCCA, on the merits, denied the appellate grounds asserted.</u>

iii.   <u>On April 24, 2004 Petitioner initiated state post-conviction proceedings, arguing ineffective assistance of appellate counsel and additionally requesting to supplement the record and for an evidentiary hearing.</u>

iv.   <u>The state post-conviction courts ultimately granted the supplementation motion and on Nov. 19, 2015 denied the evidentiary hearing and denied the Ineffective Assistance of Appellate Counsel claim.</u>

v.   <u>The State Court's decision on the merits of the Petitioner's ineffective assistance of appellant counsel claim in significant parts involves the contrary to/and/or objectively unreasonable application of 14th Amendment Due Process of Law as determined by the U.S Supreme Court in its precedent and controlling Evitts v. Lucy, 105 S.CT. 830 (1985) decisions and/or it was based on the Courts objectively unreasonable determination of the facts id. in light of the evidence presented during the State trial, direct</u>

appeal and post-conviction relief proceedings. Argument and citation to support the allegations of this claim and all sub claims are made in the Brief in Support filed contemporaneously with this Petition. The following propositions under ground one are IAAC sub-claims:

## One: Insufficient Evidence to Sustain Conviction
### (See supporting brief Pgs.6-12)

**FACT 1: All testimony presented by the alleged victim, H.D., was inconsistent, unclear, and improbable.**

i.     H.D. testified to the events surrounding the disclosure to her mother [Valerie Dyer] and facts surrounding the alleged abuse. Most of her testimony was given through a forensic interview (See Attachment G) as H.D testified to having no recollection of being abused or what she said during the interview. Being such, she was ruled as an "unavailable witness". Her testimony contradicted itself eleven (11) times, was inconsistent with material facts three (3) times, ranged from improbable to impossible seven (7) times, was unclear or uncertain eleven (11) times, and contained an additional eighteen (18) "I don't know" type answers during the forensic interview (See Attachment A for a detailed list of this testimony). The most material of these statements concern the events surrounding the abuse date, disclosure, evidence of coaching, and her inability to describe the locations and acts of the alleged abuse.

ii.     H.D. gives contradictory testimony numerous times[1]. During the forensic interview (See Attachment G), H.D. states that she was last abused on "January 2nd", though she is unable to tell the interviewer how she knows this date. H.D. contradicts herself repeatedly concerning the specific acts of alleged abuse on the 2nd and contradicts that abuse took place at all on this date by stating four times that she wasn't even abused on January 2nd. At the first trial, H.D. actually testified that no abuse occurred during her entire stay with the Petitioner (T1.16). She gives contradictory testimony concerning where she was last abused, what acts were committed during the last abuse, and details of specific acts.

---

[1] See Attachment A at section (I) Pages 1-2 for a full list of contradictory statements

iii.    H.D.'s testimony is inconsistent with material facts and is refuted by the testimony of Dr. Waters and DNA evidence collected at the alleged scene of abuse[2]. Her testimony is proven improbable by DNA evidence, testimony of the Petitioner, Amanda Monsalve, and Jan Dyer, as well as the testimony of the State's own witness, Dr. Waters[3]. H.D's testimony about "hurrying up and getting dressed" when Amanda came home (See Attachment G and Video Transcript pg. 20) defies physical laws as it would take less than ten (10) seconds to be in view of Petitioner's bedroom upon returning home (See Attachment A-1 Diagram of home), making this testimony impossible as there are no windows in the bedroom and the outside door is less than 24 inches from and adjacent to the bedroom door.

iv.    H.D.'s statements and testimony are completely unclear[4]. H.D. is uncertain of what dates the alleged crimes took place, what abuse occurred, where she saw the acts described, or what the surroundings looked like where the alleged abuse happened. At trial, H.D. was unsure if what she said in the interview was even correct. It was so unclear that the interviewer, Jessica Taylor, testified that she was unable to say what, if any, abuse H.D. had claimed (T1.50). What *is* clear, however, is that H.D. has been coached and is not telling what actually happened but is rather attempting to regurgitate a story that has been taught to her by Valerie Dyer.

v.    In the event and to the extent the State Post-conviction court's findings of facts of the testimony was not contrary to clearly established Supreme Court rulings, those findings are clearly erroneous and rebutted by clear and convincing evidence. The determination of the facts that H.D's testimony was not contradictory, inconsistent, unclear, or improbable, is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

vi.    The State trial court's ruling that the witness was unavailable involves a contrary to and/or is based on its objectively unreasonable application of **Crawford v Washington** and /or is based on the court's unreasonable determination of unavailability in light of the evidence presented during the trial. This precluded the defense from being able to fully cross-examine the only witness against him.

[2] See Attachment A at section (II) page 2 for supporting facts
[3] See Attachment A at section (III) pages 2-4 for supporting facts
[4] See Attachment A at section (IV) pages 4-5 for supporting facts

## FACT 2: There is evidence that H.D. was coached

i. In support of the contention that H.D. was coached, one needs to only look at the evidence presented by the State of Oklahoma[5]. H.D. admits that she didn't know what date to give investigators as a day of abuse, but that her mother told her what to say; she admits that she "can't remember the whole story" to tell investigators; H.D. gives "January 2nd" as an answer to questions that are not asking a date because she was taught to say the phrase "January 2nd"; there's evidence that H.D. was coached the day prior to trial in the prosecutions office to claim that she was raped in a tent; H.D. admits that Valerie was the one who first suggested Charles was the perpetrator of a sex crime when H.D. hadn't even made a complaint to Valerie; and on January 12th, during the forensic interview, H.D. described the sexual acts and circumstances found in pornography that was downloaded on Valerie's computer the night prior on January 11th. Evidence, in the form of an email, suggests that after this pornography was downloaded, Valerie felt that H.D. was sufficiently coached and was confident of H.D.'s descriptions. In this Email that Valerie sent to Amanda (Petitioner's girlfriend), she is laughing at him and gloating that he was about to be arrested soon (See attachment B-4). Had Valerie not coached H.D., these statements and circumstances would not be present and there is no other reasonable explanation for them.

ii. Further evidence tending to show coaching is Valerie's testimony that she never spoke to H.D. about the sexual abuse (T3.91-92) and never asked H.D. about what happened (DH.28). This is false testimony, however, to cover up the fact that she had coached H.D. because the prosecution had informed her not to interview H.D. In an audio recording (See Attachment B-2), however, Valerie admits that she "interviewed" H.D. numerous times in mock interviews and spoke in detail with H.D about the abuse, which was certainly not her testimony to the jury. The jury was unaware that Valerie had misled them on this matter. Had Valerie not coached H.D., she would not have mislead the jury.

iii. The state court's determination of the facts that H.D. was not coached is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

---

[5] See Attachment A at section (V) pages 5-7 for supporting evidence of the contention that H.D. was coached.

**FACT 3: The state presented absolutely no corroboration of the alleged crime, though State law requires it.**

i.    Though the state may attempt to argue that Dr. Water's medical report corroborates the crime charged, it would be incorrect in such an endeavor. According to state law, Dr. Water's testimony cannot corroborate the crime. Dr. Waters examined H.D. for sexual abuse on January 13, 2010 [10 days after alleged disclosure]. He testified that he has minimal sexual abuse training (T1.8-15) and is not certified in pediatrics (T1.12). Dr. Waters testified that his examination took "maybe 30 seconds or so" in the dorsal lithotomy position (T1.14-16) at which time he "did not see" any posterior hymenal tissue (T3.130).

ii.    Petitioner presents seven (7) articles written by sexual abuse experts that state that abnormal findings must be confirmed in the knee-chest position because sometimes the hymen can be "difficult to see" (See Attachment E-1). Dr. Waters testified that he has never done research on this subject (T1.19-21) and did not confirm his findings in the proper position (T1.20-21). Though Dr. Waters testified that H.D. had no posterior hymenal tissue, his written report states only that he was "**not able to see** any hymenal tissue posteriorly"(emphasis added) which is consistent with an exam that was done improperly for a prepubertal girl that does, in fact, have an intact hymen. Dr. Waters testified that he knew pictures of the exam would be useful for court but made the decision to neither take pictures (T1.15-17) nor draw a diagram of his findings for the court. Because of this negligence, any independent review of the alleged missing hymen is impossible.

iii.    However, all of this is rendered moot because even had Dr. Waters conducted the exam correctly, confirmed his findings, and still found no hymenal tissue, his testimony has no relevant impact on the case. He admits that he can't say with certainty that sexual abuse even occurred (T1.21-22). Any lack of ability to prove recent abuse and the destruction of possible exculpatory evidence lies on the State because law enforcement unreasonably waited (10) days after alleged abuse instead of taking reasonable action by obtaining a rape kit at the emergency room. If recent abuse had occurred, there was more than ample time to obtain physical evidence of this. However, exculpatory evidence could be gathered as well, which is the more likely reason that the state waited.

iv. Though the state court never made any rulings concerning the lack of corroboration, one must make the assumption that the court believes there is corroboration. Any State court's determination of the fact that there was corroboration of the crime is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

## FACT 4: The evidence presented by the defense is corroborated by both physical and testimonial evidence.

i. Petitioner testified to having numerous heated arguments between April, 2009-January, 2010 with Valerie and filing for divorce July, 2009 on grounds of adultery (T1.24,40-41,88-89,94)(T3.125,128-134,153-154). Valerie and Amanda Monsalve (Petitioner's girlfriend) both corroborate this testimony. Many of these arguments concerned custody over H.D. Petitioner testified that he once threatened to take custody of H.D. while he was in California and Valerie was in Oklahoma; this resulted in Valerie having false charges pressed on him by military authorities while he was in the Marine Corps. Valerie called the Petitioner laughing and informed him that he was in trouble. Petitioner was arrested and then released after Valerie called the command and informed them that she had lied (T1.24-28)(T3.128-130). This was corroborated by Valerie (PH.110,113)(T1.74-75), Amy Dark (T1.6-9)(T3.157-158), and Amanda Monsalve (T1.18-19)

ii. Concerning the specific allegations of abuse, Petitioner testified that during the summer of 2009 he only slept under the same roof as H.D. one day because he lived in a tent on the property. H.D. never stayed in or saw the tent (T1.31-34). This is corroborated by Jan Dyer (T1.10-13)(T3.181-185). Petitioner testified that he lived in California from August-December 2009 and did not see H.D. at all (T1.35-37)(T3.128). This is corroborated by Jan (T1.7-9) and Amanda (PH.72)(T2.13-15). Petitioner was left alone with H.D. on only two (2) separate occasions during Christmas break 2009; December 17th for thirty (30) minutes, fifteen (15) of which he was on the phone with Amanda (T1.40)(T3.135-136) corroborated by Amanda (T1.10-11); December 28th for one hour in which Petitioner was outside when Amanda left the home and was still outside when she returned (T1.44-46)(T3.135-138) corroborated by Amanda in which she additionally testified that nothing was unusual upon returning (T1.11-12)(T3.62).

Petitioner testified specifically about January 2nd on which the alleged abuse supposedly occurred, stating that the entire family (Petitioner, Amanda, Amanda's daughter I.C., and H.D.) was together all day and he was never alone with H.D. (T1.46-49)(T3.138,141-146) corroborated by Amanda (T1.13-15)(T3.30-34).

    iii.    Amanda Monsalve corroborated all of Petitioner's testimony concerning dates and events surrounding the alleged day of abuse and confirms that H.D.'s testimony is impossible. Amanda testified that she had known the Petitioner and Valerie since 2005 and had never noticed anything unusual with H.D. through 2010 at which time she lived with the Petitioner (PH.80)(T1.3-5,11-12,17-18)(T3.4,16). Amanda testified to how angry Valerie seemed at learning Amanda was in a relationship with Petitioner (T3.14). She testified that Petitioner and Valerie were fighting over custody with H.D. and Valerie's drug use, and that Petitioner wanted custody of H.D. (PH.79,84-85)(T1.79). She testified to receiving a vengeful e-mail from Valerie on January 11th, 2010 [8 days after alleged abuse] in which the subject line was "Haha ha-ha" and stated to Amanda "Good luck. He's going to need it" and "Thanks for taking him. I hope you enjoy him" (T1.18-19)(T3.46-47)(See Attachment B-4 E-mail). She testified that Valerie constantly would laugh at Amanda and Petitioner, and would "flip them off" at court hearings (T3.22). Amanda testified that she was concerned that Valerie was attempting to have Petitioner falsely arrested, as she had in the past, after receiving the "HaHaHaHA" e-mail and accompanied the Petitioner to the sheriff's dept. the next day to make inquiry (T1.18)(T3.46-47) where he was arrested.

    iv.    Concerning the specific allegations of abuse on January 2nd, Amanda testified that the allegations are impossible as the Petitioner could have, in no way, been left alone with H.D. On the morning of January 3rd, she saw nothing unusual with H.D., H.D. took a shower and was playing and having fun with I.C.; H.D. made no complaints about hurting or anything else (T1.15-18)(T3.32-36,38-39). Amanda gave law enforcement the unwashed panties and pajamas that H.D. worn the weekend of December 31st - January 3rd (T1.15,21-22)(T3.37-38) which is corroborated by Deputies Seely and Lemons in their testimony at the first trial.

    v.    The state court's determination of the facts that the defense was not corroborated is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

**FACT 5: Charles and Valerie Dyer were amidst a heated divorce with issues surrounding custody during the time-frame of the allegations**

i.  Valerie admitted that she was afraid that the Petitioner would gain custody of H.D.(T1.32), that she would "do or say anything" to prevent him from gaining custody (PH.110), and that she would commit perjury if necessary (T1.72). Additionally, she was recorded saying that she wouldn't tell the truth in court if it risked her losing custody of H.D (See Attachment B-1 and transcript Pgs.4-5)

**FACT 6: There is evidence of malicious prosecution by Valerie Dyer, including her repeated acts of perjury, inconsistencies surrounding the alleged disclosure, and recorded statement that she would lie in court to gain custody of H.D.**

i.  Valerie Dyer's testimony is extensively perjured/inconsistent. Valerie gave testimony that was contradictory of her own testimony a total of nineteen (19) times, inconsistent with facts and evidence ten (10) times, and was impeached at least three (3) times in front of the jury[6] while attempting to falsely attack the Petitioner's character and prejudice him to the jury.

ii.  Valerie admitted that she was afraid that the Petitioner would gain custody of H.D.(T1.32), that she would "do or say anything" to prevent him from gaining custody (PH.110), and that she would commit perjury if necessary (T1.72). Additionally, she was recorded saying that she would not tell the truth in court if it risked her losing custody of H.D (See Attachment B-1 and transcript Pgs.4-5)

iii.  The most important of Valerie's perjury involves the inconsistencies surrounding disclosure. Valerie testified to a series of events surrounding disclosure which are absolutely impossible[7]. H.D. Testified that the abuse occurred on January 2nd, 2010. Valerie testified to the following: **(1)** she picked H.D. up from Petitioner's home the following day on January 3rd (T3.72-73)(T1.46-49,80-81). This was corroborated by Amanda Monsalve (T3.32,43), Jan Dyer (T3.177), Petitioner (T3.138), and school records (See Attachment B-5). **(2)** upon picking H.D. up, she was "crying" and "not acting like herself". When asked several times what was wrong, Valerie claims that H.D. stated "I don't want to talk about it" (T3.73-74). **(3)** disclosure of abuse by Petitioner was made to her by H.D. this evening in which Valerie

---

[6] For a full detailed list of supporting facts of Valerie's perjury/inconsistencies, see Attachment B.
[7] See Attachment B at section (I)(A) pages 1-2

asked H.D. what was wrong and H.D. stated that Petitioner touched her **(4)** Valerie reported the abuse to law enforcement "the next day" [Jan 4, 2010][8]. **(5)** H.D. was absent from school this week from Jan 4-8, 2010 (T1.80).

iv.     However, the evidence proves that the only truthful testimony from Valerie was the day she picked H.D. up from the Petitioner's home. The testimony concerning H.D. crying and not acting like herself is contradicted by Valerie's own prior testimony that H.D. never cried until later that evening in the bathtub (PH.101) and when asked at the Daubert Hearing specifically about the ride home, Valerie says nothing of crying or asking H.D. what was wrong (DH.51). Valerie testified that the only thing unusual was that H.D. seemed tired (T1.46). More interesting is that H.D., herself, testified that Valerie never once asked her if something was wrong during the ride home (T3.112), that she never did anything to cause Valerie to question her, and it was in fact Valerie that first suggested that Petitioner had touched H.D.[9]. Valerie's testimony of reporting the abuse to the police "the next day"[Jan.4] is refuted by Deputy Seeley[10] and Valerie's own testimony that the report was made on January 8th (DH.15). Valerie testified that H.D. did not attend school this week (T1.80). However, school records (See Attachment B-5) prove that this testimony is false as well since H.D. did, in fact, attend school this week. Common sense reveals that Valerie gave this testimony because it's not reasonable that a parent would send their child to school for four (4) days after learning that she was sexually abused and seeing the injuries described. It cannot be contested that Valerie perjured herself concerning the disclosure and the events surrounding it.

v.     The state court's determination of the facts that there was no malicious prosecution by Valerie Dyer and this evidence had no evidentiary value is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

---

[8] Valerie testified numerous times that she reported the abuse "the next day" See Valerie's testimony at (DH.15)(PH.114)(T1.51)(T3.84)

[9] See the forensic interview Attachment G and G-1 Transcript Page 33

[10] See Attachment B-17 (Affidavit) and Trial testimony at (T1.11-13)

**FACT 7: Forensic DNA evidence prove that the allegations are highly unlikely and H.D.'s testimony is improbable as no incriminating evidence was found on the unwashed panties worn during the alleged rape or on the bed or couch where the rapes supposedly occurred.**

i.     DNA evidence was obtained from Petitioner's home on January 12th, 2010. The State collected the bed sheets, blankets, and pillows from the Petitioner's bedroom. They obtained the couch cushions from the living room, and they collected H.D.'s pajamas and panties from the dirty clothes basket (See Attachment F at Pg.6). Though Dr. Waters testified that a child of that age would bleed after sexual intercourse, no blood, body fluids, skin cells, or other DNA belonging to H.D. was found on the bed where H.D. claims she was raped. Skin cells belonging to every permanent resident of the home were found because they had all been in the bed at some point. No incriminating DNA was found on the couch where H.D. claims she was raped. No incriminating DNA was found on the pajamas or panties that H.D. was wearing during the alleged rape (See Attachment H). Valerie Dyer's testimony corroborated that H.D.'s clothes were left at Petitioner's home (PH.107). That H.D.'s skin cells were the only ones absent from Petitioner's bed where she claims to have been raped, and that the panties worn during the alleged abuse bore no incriminating evidence is strong evidence of the Petitioner's innocence.

ii.     The state court's determination of the facts that the DNA forensic evidence had no evidentiary value is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

**FACT 8: 2-9 days prior to the alleged abuse, Valerie's computer was used to do approximately 20 website searches concerning what is required to convict someone of crimes against children.**

i.     During the preliminary hearing in 2010, while being questioned about the Petitioner's computer, Valerie let it slip that the State had found pornography on her own computer (PH.111). The State of Oklahoma denied that it had found pornography on her computer and refused to turn it over to the defense. Against the State's objection, and just two (2) weeks prior to trial, the court ordered the State to make the hard drive available. The defense hastily hired computer expert Marvin Dutton to examine the hard drive the week prior to trial.

ii.   Marvin Dutton testified to his extensive experience with computers and his work with the military and N.A.S.A. in this field (T1.5-10). Mr. Dutton limited his investigation of the hard drive to December 2009-January 2010. He found that from two (2) to nine (9) days prior to the alleged disclosure, approximately twenty (20) website searches were done concerning what is required to convict someone of crimes against children, sexual abuse and misconduct toward a child, legal rights over a child, neglect when a parent is a danger to a child, child abuse, adoption and custody (T1.12-16,23). [11]

iii.   The state court's determination of the facts that the websites searched by Valerie has no evidentiary value is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

**FACT 9: Forensic Computer evidence proves that Valerie's computer was used to view pornographic material the night prior to H.D.'s forensic interview where she described the exact actions and surroundings found in said pornography.**

i.   After the first trial in 2011, the State conducted an independent forensic exam of Valerie's hard drive through the O.S.B.I.(See Attachment D). The report from this examination corroborates the testimony of Marvin Dutton but also contains further exculpatory evidence. The O.S.B.I. investigated computer use over a one (1) year period including the entire year of 2009 and January 2010. Out of the entire one (1) year period, there is only one (1) day that the computer is used to extensively view pornographic videos for an eight (8) hour period; that day is January 11th, 2010 from 1225 to 2036[12].

ii.   It's no coincidence that H.D.'s forensic interview is the very next day on January 12th where H.D. describes sex acts and circumstances that mirror that of the pornography found on Valerie's computer[13]. Equally devastating to the States case is that Valerie can be placed at the computer within minutes of this

---

[11] The information available on these websites can be seen in <u>Attachments D-3</u> through <u>D-7</u>. This was all done prior to the alleged disclosure and abuse. This evidence was presented at the first trial which resulted in a hung jury but was not presented to the third jury that resulted in conviction due to IAC.

[12] See Attachment D pg. 3-4 for the OSBI forensic report proving this date of download.

[13] See Attachment D-1 and D-2 for videos and samples of pictures found on Valerie's hard drive. Presented are 10 images of sexual acts on a couch, 3 images containing white pillows, 3 images of sex acts with a male on top of a female, 6 images of males performing oral sex on a female, and 39 images of females performing oral sex on a male. Also are several images of semen, females gagging and swirling their tongues around penises. Nothing H.D. described was accurate of Petitioner or his home but mirrored these videos exactly.

viewing due to the fact that a search was done for "Amanda Monsalve" on www.myspace.com this evening at 2023 (See Attachment D pg.8). This is when Valerie sent the MySpace e-mail laughing at Amanda, telling her "I hope you enjoy him before this week is over", and wishing Petitioner "good luck because he'll need it"(See Attachment B-4 for this E-mail). Making the assumption that this e-mail took five (5) minutes to write and send, pornography was viewed within five (5) minutes of sending the message at 2033, proving beyond doubt that Valerie was the person downloading said pornography or, at the very least, had knowledge of who had done so.

iii.     The state court's determination of the facts that the forensic computer evidence had no evidentiary value is objectively unreasonable in light of the evidence presented to the post-conviction courts. Additionally, the court's determination that the dates of files on Valerie's computer are not accurate is objectively unreasonable in light of the fact that OSBI agent Raines only testified that he was unable to verify the dates due to a blown power supply, not that the dates were incorrect. Not only could the state have bought a power supply in order to verify the dates, as Agent Raines testified to, the state of Oklahoma had used the computer prior to the power supply being damaged and was, itself, the cause of the damage. Beyond this, the dates can be verified by other evidence which correspond exactly with the dates provided on the hard drive, i.e. the Myspace email received by Amanda Monsalve which coincides to the exact date and time frame that the only Myspace search was done for "Amanda Monsalve" by Valerie Dyer on her computer (See OSBI forensic report Attachment D)

**FACT 10: The jury was not presented with the evidence linked to the forensic DNA and computer reports or with readily available evidence that Valerie was committing perjury on numerous subjects. This effected the Jury's determination of credibility and guilt.**

i.     See Attachment B for a full list of perjury committed by Valerie.

ii.     The jury was never presented with any of the evidence linked to Marvin Dutton, Agent Raines, or the OSBI forensic computer report (Attachment D).

iii.     The jury was never presented the testimony of Forensic experts Sarah Ferrero which shows that no incriminating DNA evidence was present on H.D.'s panties which were worn during the alleged abuse

and were unwashed when tested. The jury additionally was unaware that the only person from the home whose DNA was not found on Petitioner's bed was H.D. alone. This also precluded the jury from seeing the DNA written report.

iv.    The state court's determination of the facts that the jury's determination of credibility and guilt, based on evidence not presented to them, was not effected is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

## FACT 11: There is evidence that links disclosure directly to H.D. coming from a registered sex offender's home

i.    The timeline in this case is extremely critical and proves the state's testimony as absolutely impossible when reviewed. Regardless of any scenario that can be conjured, Valerie's actions are completely impossible and further unreasonable for any parent that had just learned that their child had been raped. By the States evidence, there are only two possible scenarios:

ii.    **Scenario A** Valerie picked up H.D. from Petitioner's home on January 3rd and disclosure was made this evening. This is consistent with H.D.'s interview where she said that she told her mother "Sunday" [Jan. 3rd] of the abuse. Then, Valerie sent H.D. to school for the next four (4) days as if nothing happened until January 8th when she finally decided to contact police for some reason. In this scenario, Valerie lied about sending H.D. to school this week and reporting the crime "the next day". This scenario would involve Valerie seeing injury to her daughter, learning of abuse, yet sending her child to school the rest of the week, not contacting police for five (5) days, and not seeking any medical attention whatsoever. The alternative is scenario B.

iii.    **Scenario B** Valerie picked up H.D. from Petitioner's home on January 3rd. No disclosure was made and H.D. showed no signs of distress. Valerie learned of the sexual abuse four (4) days later on January 7th and went to the police "the next day" which is consistent with police reports (See Attachment B-17), the medical report (See Attachment E), and the testimony of Amanda that Valerie learned of the disclosure on Thursday [January 7th](T3.67). In this scenario, Valerie lied about H.D.'s demeanor upon picking her up and the disclosure being made coming directly from Petitioner's home.

The testimony of H.D. grabbing herself and crying would actually have been four (4) days after leaving Petitioner's home.

    iv.    Facts prove Scenario B as the most likely and place the case in a completely different light due to the following: **1.** H.D. is recorded as going to school on the disclosure date of January 7th (See Attachment B-5),. **2.** Valerie testified that H.D. went to her mother's home after school (T3.104). **3.** Valerie admitted that her uncle is a registered sex offender (PH.117) and lived with Valerie's mother (T3.14). **4.** So Valerie's testimony of H.D. grabbing herself and crying would have been after H.D. had come directly from a sex offender's home that was charged with exposing himself to a four (4) year old W.H., admitted exposing himself to his minor cousin T.B., and attempted lewd acts on a minor[14]. This scenario is consistent with the facts, consistent with Valerie's mother's attempt to hide the fact that the sex offender lived in the home, consistent with H.D.'s inability to describe Petitioner's bedroom or tent and evidence of coaching, and Valerie's need to do multiple mock interviews and then lie to the jury about it.

    v.    The state court's determination of the facts that there was no evidentiary value in H.D.'s disclosure coming directly from a sex offenders home is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts.

## Two: Ineffective Assistance of Trial Counsel

**FACT 1: Trial counsel failed to object to 33 hearsay statements that were prejudicial and counsel could have easily shown many of them as perjured. (See supporting brief Pgs.13-14)**

    i.    Valerie testified to thirty-three (33) hearsay statements that she claims Petitioner said to her. These statements are found during the third trial at the following **page** and line numbers:

Page.24:Line.22; **25:**12,16,23; **29:**2,17,24; **30:**1,11; **31:**14; **32:**10; **37:**9; **42:**16; **44:**1; **45:**13-15; **47:**19; **48:**20; **50:**16; **51:**3,16; **53:**12; **55:**3,13; **57:**15; **58:**13; **59:**10; **60:**25; **61:**22; **66:**12-13; **68:**20,22; **70:**14.

---

[14] See <u>Attachment C</u> for police reports and evidence to support the contentions about James Hekia's past sexual acts with minors and the fact that his family attempted to hide his residence in the home during the alleged crime from law enforcement.

ii.     These statements allegedly made by the Petitioner were offered to prove that Petitioner made statements to force Valerie to promise to get an abortion, called H.D. "Cancer" in Valerie's stomach, disregarded his violence toward Valerie, forced her to leave her family wantonly, refused to attend to H.D., was uncaring to H.D.'s needs for her mother, stated that H.D. was in his way, that he had no time for H.D., that he grounded Valerie from the phone, uncaringly did not want to speak to H.D., that Petitioner no longer wanted Valerie and H.D, mislead Valerie as to why he was going back to California in 2009 to be with Amanda Monsalve. Eleven (11) of these statements are proven perjured (See Attachment B and testimony at T3.29,47,48,50,51,53,55,57,66,and 68).

iii.    The state court's determination of the facts that counsel was not deficient for failing to object to testimony that he had readily available evidence was perjured is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts.

**FACT 2: The prosecution made numerous improper statements during closing arguments while counsel sat silently and allowed them to seriously prejudice the jury against his client.** (See supporting brief Pgs. 14 for argument and citation)

i.      The State made four (4) misstatements of the evidence, seven (7) statements of personal belief, and allowed witnesses to commit perjury numerous times[15].

ii.     The State also made improper comments that Petitioner didn't love his family, and stated that H.D. was tragically heartbroken and had to live the rest of her life with what Petitioner did to her (T3.190), further asking the jury to improperly give sympathy to H.D. and consider this when deliberating on guilt (T3.219).

iii.    Counsel made no objection to this improper conduct of the prosecution

iv.     The state court's determination of the facts that counsel was not deficient for failing to object to this prosecutorial misconduct is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts.

**FACT 3: Defense counsel failed to present readily available expert testimony from 7 separate witnesses to challenge the state's evidence; failed to call Lori Crosbi to rebut Valerie; failed to call the custodian of school records to prove Valerie's testimony of the timeline as**

---

[15] See IAAC Sub Claim V "Prosecutorial Misconduct" Pgs. 29-36 of this Petition.

**perjured; and failed to investigate and obtain an expert witness to challenge Dr. Water's findings; in effect failing to place doubt in the State's case.** (See supporting brief Pgs.15-18 for argument and citation)

i.      Defense counsel failed to call Deputy Seeley. Deputy Seeley would testify that Valerie didn't contact police until five (5) days after the alleged disclosure. Through him, his police affidavit reflecting the same could be introduced. Seeley would testify that he gathered the DNA evidence at Petitioner's home and there were no white pillows present, contradicting H.D.'s testimony of white pillows and corroborating the defense. By not calling Seeley, the defense was unable to stress the critical fact that Valerie was lying about disclosure and reporting the alleged abuse to police, show inconsistencies in H.D.'s testimony, and poke holes in the State's case, creating doubt of the alleged charges.

ii.     Defense Counsel failed to call Deputy Lemons. He would testify that H.D.'s panties and pajamas sent for DNA testing were obtained from the dirty clothes hamper, corroborating Amanda's testimony. He would testify that Petitioner was wrongfully arrested on a complaint made by Valerie in Sept. 2010, in front of the courthouse as he was the arresting officer; this would show Valerie committed perjury when she testified that she never tried to have Petitioner arrested for charges other than sexual abuse (T3.147-149).

iii.    Defense counsel failed to call computer expert Marvin Dutton. He would testify that Valerie's computer was used to access websites containing information about termination of parental rights, how to report sexual abuse of a child, how to convict someone of crimes against children, and all of this was done eight (8) days prior to the alleged abuse. This evidence shows premeditation of making false allegations, corroborating the defense theory and critically attacking the State's case.

iv.     Defense counsel failed to call OSBI forensic computer expert Donald Raines. He would testify that he examined Valerie's computer on July 15, 2011, allowing admission of his written report (See Attachment D). He would not only corroborate Expert Dutton, he would testify specifically that Valerie's computer was used to research "Termination of Parental Rights", "Oklahoma Parental rights", and "Getting Parental Rights Back", as well as accessing childwelfare.gov containing information about "Penalties for false reporting of child abuse" and "Grounds for Involuntary Termination of Parental

Rights" which states that the most common ground includes "sexual abuse" (See Attachments D-3 and D-4). He would testify that the computer was used to view pornography on the same day that parental rights searches began on Dec.25, 2009 (The day Petitioner picked up H.D. for Christmas break). He would testify that pornographic videos were accessed at Redtube.com and that on only one (1) day it was accessed multiple times; this was on Jan.11, 2010, the day prior to H.D.'s forensic interview. He would testify that a search for "Amanda Monsalve" was done at 2023 on myspace.com just minutes before pornography was viewed at 2033.

    v.   This testimony would link Valerie to the computer use through the testimony of Amanda that Valerie had sent her a MySpace message this evening laughing at her and insinuating that something bad was about to happen to the petitioner (See Attachment B-4 for message). It would prove premeditation and malicious prosecution. It would allow the defense to show the jury that what H.D. was describing was identical to the images and events in the pornography downloaded on Valerie's computer. And the viewing of the pornography the evening prior to H.D.'s interview, the descriptions H.D. gave, coupled with the laughing email Valerie sent to Amanda would prove beyond a reasonable doubt that Valerie coached H.D. The evidence that Donald Raines would give is devastating to the State's case and fully corroborates the defense.

    vi.   Defense Counsel failed to call OSBI DNA forensic expert, Sara Ferrero. Through her testimony, the DNA report (See Attachment H) could be introduced which proves no white pillows were found as H.D. claimed, that all residents of the home had skin cells found on the bed, yet H.D.'s was not, and that H.D.'s panties worn during the alleged abuse were tested for incriminating DNA and none was found. This evidence would refute that H.D. were ever in Petitioner's bedroom as she testified and would corroborate the defense as it is extremely unlikely that the abuse described could have been committed without leaving DNA evidence (See Dr. Waters testimony at T1.27-29).

    vii.   Defense counsel failed to call Officer Dan Fletcher. He would testify that Valerie Dyer and her boyfriend made false complaints against Petitioner concerning Petitioner stalking Valerie and vandalizing property on Mar.14 and 16, 2011 as well as May.24, 2011; and that Valerie accused Petitioner of

hijacking her e-mail[16]. This would prove that Valerie committed perjury concerning her denial of trying to have Petitioner arrested for crimes other than the sexual abuse (T3.147-149). This testimony would not only destroy the credibility of the State's witness but would corroborate the defense theory that Valerie will use the State as a tool of vengeance against Petitioner.

viii.  Defense Counsel failed to call Duncan Police Officer Corchoran who responded to a call made by Petitioner after Valerie began screaming at him and refused visitation of H.D. in early July, 2009. This would impeach Valerie on her testimony that police were not called (T3.93-94). This is corroborated by an audio recording from July, 2009 in which Valerie admits that cops were called and that it was her fault (See Attachment B-1Transcript pg. 2). Calling this witness would impeach the State's witness and increase Petitioner's credibility.

ix.  Defense counsel failed to call Lori Crosby as a rebuttal witness to Valerie Dyer. She would testify that she never viewed pornography on Valerie's computer as Valerie testified. This would diminish the credibility of the State's witness and corroborate the defense theory that Valerie conjured up false charges and coached H.D.

x.  Defense counsel failed to call the custodian of records from the Duncan School System to show H.D. attended school from Jan.4-7, 2010, contrary to Valerie's testimony. Through this testimony, school records could be introduced (See Attachment B-5). The fact that H.D. attended school for four (4) days after the alleged disclosure would place extreme doubt with the jury that the disclosure happened at all.

xi.  Defense counsel failed to call any expert witness to rebut the findings of Dr. Waters. Petitioner presents numerous articles written by sexual abuse experts that state that abnormal findings must be confirmed in the knee-chest position because sometimes the hymen can be difficult to see (See Attachment E-1). Dr. Waters testified that he has never done research on this subject (T1.19-21) and did

---

[16] (See Attachment B-8 for the police report alleging Petitioner stalked Valerie on May 24, 2010) (See Attachment B-9 for affidavits of Amanda Monsalve and Jan Dyer concerning Valerie's wrongful arrest and eventual release of Petitioner on September 22, 2010) (See Attachment B-10 for Police reports reflecting Valerie's attempts to have Petitioner arrested on May 14th and 16th, 2011 for vandalism as well as May 24th, 2011 for stalking)

not confirm his findings in the proper position (T1.20-21). (See the Brief in Support for in depth argument and citation on counsel's failure to present a medical expert).

xii.    The state court's determination of the facts that counsel was not deficient for failing to call or investigate expert witnesses in order to present critical exculpatory evidence is objectively unreasonable in light of the evidence that most of the witnesses had already testified, none of the testimony harmed the defense, and the testimonial evidence was material to placing doubt in the jury's mind.

### FACT 4: Defense counsel failed to file a motion to use the testimony of Dr. Ray Hand, depriving Petitioner of his right to present a full defense and failing to preserve this issue for appellate review. (See supporting brief Pg.19 for argument and citation)

i.    Dr. Hand is a licensed psychiatrist of nearly thirty (30) years and testified to his research and interviewing process with children. He has testified multiple times in court on the subject (DH.185-189). He testified that Jessica Taylor seemed in a hurry and didn't allow H.D. to develop a narrative before asking the next question (DH.193) This is corroborated by Taylor's skipping sections of the interviewing protocol which Dr. hand would have pointed out at trial. Dr. Hand testified that the use of anatomical dolls tend to have children offer more fantastic details than children interviewed without them (DH.194).

ii.    The state court's determination that counsel was not deficient for failing to reassert this motion in order to preserve it for appellate review is objectively unreasonable in light of the facts of how easily it was to refile said motion and the district court's decision being contradicted by state court precedent. Any reasonable and competent attorney would have refiled, and thus preserved for review, this motion,

### FACT 5: Counsel failed to object to improper attacks against Petitioner's character. (See supporting brief Pg. 20-21 for argument and citation)

i.    Throughout Valerie Dyer's testimony, Petitioner's character is attacked with numerous comments about his bad acts and vile treatment of his family. Valerie testified that Petitioner was angry about Valerie "bringing a child into this world"(T3.26), called H.D. "cancer in her stomach", punched Valerie in the stomach and was disgusted at Valerie's pregnancy (T3.25), faked being happy about having a baby when around others (T3.27,31,35), only rubbed Valerie's belly or talked to the baby once or twice during

the pregnancy (T3.28), forced Valerie to move to TN. Because Petitioner was controlling and didn't want Valerie's family around H.D. (T3.29-30), refused to help with H.D., refused to hug or hold H.D., cussed Valerie (T3.31), was angry at Valerie for paying attention to H.D., neglected H.D. (T.3.32,38); Petitioner stated H.D. was in his way (T3.39,51-53); Petitioner had no interest in H.D., controlled Valerie and didn't want her around her family, grounded Valerie for a week from the phone (T3.40,44-47), never called to speak to H.D. unless Valerie forced the issue (T3.48,52), and Petitioner was upset that Valerie moved out of his parent's home and refused to send money to she and H.D. to help (T3.13,50).

   ii.   Petitioner contends that almost all of this testimony is inconsistent with prior statements and evidence that was readily available to defense counsel i.e. letters written by Valerie (See Attachment B-13 which shows that it was Valerie who did not like her own family, Petitioner was a loving husband, and Valerie felt she was not a good wife), Skype messages (See Attachment B-14 which prove that Valerie lied about Petitioner stating that H.D. was in his way and leaving Valerie stranded in Oklahoma), copies of bank statements (See Attachment B-7 which prove Valerie lied about Petitioner stranding her in Oklahoma with no money), and signed receipts of child support by Valerie (See Attachment B-6 which proves Valerie lied about Petitioner not helping financially). Also See Attachment B which proves that Valerie gave false testimony concerning many of these acts.

   iii.   The state court's determination of the facts that counsel was not deficient for failing to object to this testimony or preserve it for appellate review is objectively unreasonable in light of the evidence presented in the post-conviction relief courts that counsel was aware that this testimony was inadmissible for the purposes that it was given and only failed to object out of laziness.

## FACT 6: Counsel failed to investigate prior testimony of witnesses in order to impeach them, failed to investigate critical evidence, and refused to ask questions presented to him by the Petitioner. (See supporting brief Pgs. 21-23 for argument and citation)

   i.   Petitioner gave his trial counsel twenty-three (23) pages of questions and rebuttal to ask in order to impeach the State's witnesses and corroborate the defense. Petitioner did this because counsel was not present during any previous hearings or the first trial and seemed to know neither the facts nor the

testimony given previously. Regardless of how the questions were answered by Valerie or H.D., it would show inconsistencies and contradictions between the pretrial hearing and the two (2) previous trials. Counsel assured the Petitioner that he would ask the questions and point out the perjuries. However, when trial started, counsel wasn't even able to locate the question sheet and had clearly reviewed neither it nor prior testimony of witnesses. During cross examination of Valerie Dyer, counsel was ready to pass the witness without asking multiple questions or showing numerous contradictions demanded by Petitioner. Petitioner became agitated and threatened to make a spectacle in court by requesting that the court allow him to question the witness because counsel refused. Defense counsel reluctantly agreed to impeach Valerie with photographs as placation to the Petitioner and then requested a break because Petitioner was furious with him (T3.134). Defense counsel later refused to recall Valerie during the defense portion to show that she had lied about a vast array of topics (See Attachment B). Counsel was faced with glaring and crucial discrepancies between Valerie's testimony at the three trials and he failed to follow-up on his cross-examination by confronting her with her statements or by introducing the transcript.

ii.  Counsel refused to ask Amanda or Petitioner about the layout of the home or show a diagram to the jury; this would have shown that it would take less than ten (10) seconds to get from the car to within one foot of Petitioner's bedroom door (See Attachment A-1), making H.D.'s testimony about "hurrying up and getting dressed" when Amanda came home as impossible (See Attachment G and Video Transcript pg. 20).

iii.  H.D. had testified at a previous trial that she didn't recall anything unusual happening during the time that the alleged abuse had occurred. She gave impossible, contradictory, and inconsistent testimony through the video and trials (See Attachment A for a full list of said testimony). Despite these contradictions and inconsistencies, counsel never attempted to use prior testimony to impeach the only witness for the state that had direct testimony of guilt. Counsel was remiss in this regard as it was due to failure to investigate rather than any sound trial decision. Counsel was unaware of H.D's previous testimony and refused to listen to Petitioner's concerns on the issue.

iv.    Counsel failed to investigate the timeline of events (See Attachment M for a timeline list). An effective attorney would work out the chronology of events. In this case, had counsel done so, he could have argued convincingly that H.D. and Valerie's inconsistencies evinced manipulative coaching and malicious prosecution by Valerie.

v.    Additionally, since counsel failed to consult or call an expert to refute Dr. Waters, Petitioner demanded that counsel show Valerie's actions as unreasonable by inquiring of Waters if a rape victim could be seen in the E.R. or if they had no option but to obtain an appointment because no physical examination was done for nine (9) days after allegedly learning of the abuse, destroying any ability to find exculpatory evidence. He refused to ask of Waters if the State or Valerie could be seen as negligent within the medical profession for waiting nine (9) days after the alleged report of abuse to have H.D. seen by a doctor or if it was uncommon for a mother to wait over a week to seek medical attention after seeing the injury that Valerie claimed.

vi.    The state court's determination of the facts that counsel was not deficient for failing to investigate prior testimony or thoroughly impeach the witnesses is objectively unreasonable in light of the evidence presented in the post-conviction relief courts that counsel had the information readily available to him to do so as more fully set forth and established in the Br. Supp at pages 21-22

**FACT 7: Counsel allowed jurors to sleep during critical presentation of evidence without informing the court or attempting to resolve the issue. (See supporting brief Pg. 23 for argument and citation)**

i.    Members of the jury were asleep almost every day of the trial. Petitioner brought this to counsel's attention numerous times, eventually threatening to disrupt proceedings by standing up and telling the court. Counsel eventually became irritated with Petitioner and reluctantly informed the court that jurors were asleep to which the court requested that they attempt to stay awake. Petitioner's trial notes reflect three (3) separate times that Petitioner notified counsel that a female juror in purple was asleep during the testimony of Jessica Taylor, Dr. Waters, and while the forensic interview played (See Attachment K, trial

notes). Additionally, Petitioner verbally informed counsel that several jurors were asleep during Dr. Waters' testimony and that an old man was falling asleep constantly throughout the trial.

 ii. The state court's determination of the facts that counsel was not deficient for allowing jury members to sleep during the trial is objectively unreasonable in light of the evidence presented in the post-conviction relief courts. There is no doubt that counsel should have ensured that the jury were conscious during the introduction of evidence that was critical to the case as more fully set forth and established in the Br. Supp at page 23

**FACT 8: Counsel failed to request proper jury instructions.** (See supporting brief Pgs. 24-25 for argument and citation)

 i. The state was required by law to present corroboration of the crime alleged due to the testimony it presented by H.D. Counsel did not request an instruction to reflect this. Had he done so, Petitioner could not have been convicted.

 ii. The state was required by law to elect a crime upon which to base a conviction. Counsel failed to request that an instruction reflecting this be given. Had he done so, it is likely that the jury would not have convicted him.

 iii. The state court's determination of the facts that counsel was not deficient for failing to request proper jury instruction is objectively unreasonable in light of the evidence presented in the post-conviction relief courts that prove the lack of these instructions violated Petitioner's Constitutional rights and counsel should have had the minimum legal knowledge of rape cases in order to have known that the law required corroboration and a unanimous jury instruction as more fully set forth and established in the Br. Supp at pages 23-25

**FACT 9: Counsel failed to present readily available evidence to overcome the State's motion in limine.** (See supporting brief Pgs.25-26 for argument and citation)

 i. The court ruled that no evidence could be presented concerning Valerie's uncle, James Hekia, being a registered sex offender.

ii.     Defense counsel could have overcome this order of limine by presenting the evidence in Attachment C which was readily available to him by proving: **(1)** James Hekia has a propensity to act lewdly with young females. **(2)** James has exposed himself to underage family members. **(3)** James lived with Valerie's mother, Teresa, at the time of H.D.'s disclosure, and Teresa hid this fact from police. **(4)** Valerie admits to leaving H.D. at James's home while she used illegal drugs (T3.111). **(5)** H.D. testified that she stayed at James' home after school (T3.104). **(6)** All evidence points to disclosure date as January 7th, 2010 (See Attachment B (I)(A)(3)) and H.D. went to school this day (See school records Attachment B-5) **(7)** Thus, ultimately, Valerie's testimony of H.D. holding her private area and crying during the drive home, and having a red swollen vagina was directly after leaving the home of James Hekia which was four (4) days after Petitioner last saw H.D.

iii.     The state court's determination of the facts that counsel was not deficient for failing to present this evidence to the trial court is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 25-26.

## FACT 10: Counsel failed to fully advise Petitioner of the defense strategy when offered a 2 ½ year plea agreement by the state. (See supporting brief Pgs.26-27 for argument and citation)

i.     Petitioner was offered a 2 ½ year plea agreement and reduction of charges on the day of the third trial. At the time of the offer, Petitioner was aware of exculpatory evidence in the form of DNA evidence that proved H.D. hadn't been raped where or when she claimed; that Valerie's testimony could be shown to be perjured on numerous accounts including disclosure events and dates; that Dr. Water's examination testimony could be refuted by articles presented to counsel by his family; that Marvin Dutton would testify to the information contained on Valerie's computer proving Valerie pre-planned the allegation; that OSBI evidence corroborated Dutton's findings and further proved Valerie coached H.D. by showing her pornography the night prior to the forensic interview in which H.D. described said images, linking Valerie to this usage; and that H.D.'s testimony could be proven to be inconsistent, contradictory, and improbable.

ii.    Petitioner had no idea that Deputies Seeley and Lemons, Mr. Dutton, Sara Ferrero, Officer Fletcher, the school custodian, and Donald Raines were not being used as witnesses. All of these except Fletcher and Raines had been called at previous trials. Petitioner was shocked when the Defense rested. He confronted counsel and threatened to tell the judge that counsel was refusing to call witnesses and request that he be allowed to question them pro se, to which counsel replied "That's an issue that you can bring up on appeal" knowing full well the near impossible hurdles that a pro se litigant would be forced to face in order to do so.

iii.    Petitioner was unaware that Donald Raines and his OSBI report was not added to the witness/evidence list until after going to prison and obtaining case documents six (6) months later. Defense counsel assured the Petitioner that this evidence would be presented when counsel, in fact, had no intentions of ever presenting it. Further, counsel assured Petitioner that the DNA report contradicting H.D.'s testimony (See Attachment H), audio tapes proving perjury (See Attachments B-1 and B-2), school records proving perjury(See Attachment B-5), and police affidavits proving perjury (See Attachment B-17) would be presented.

iv.    The state court's determination of the facts that counsel's actions was not deficient in misleading his client so that he decided to not take a plea agreement is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 26-27

## Three: Infection of Trial With False Testimony

**FACT 1: The trial was infected with 38 counts of provable perjury by Jessica Taylor and Valerie Dyer. (See supporting brief Pgs.29-31 for argument and citation)**

i.    Petitioner contends that his trial was infected with thirty-eight (38) counts of provable perjury by Valerie Dyer and Jessica Taylor[17]. Valerie gave false testimony about Petitioner's cruel treatment of H.D. and Valerie. She gave false testimony to mask her drug use, propensity to lie, manipulation of law

---

[17] For a detailed list of Valerie's perjured testimony, See Attachment B and pages 31-35 of this Petition. For a detailed list of Jessica Taylor's testimony, See Prosecutorial Misconduct Pgs.35-36 of this Petition

enforcement to arrest Petitioner, her motives to fabricate false charges, and her coaching of H.D. Valerie testified falsely to the events surrounding the date of disclosure, H.D.'s school attendance, and H.D.'s actions and statements at disclosure. Valerie additionally gave false testimony to prejudice the jury against the Petitioner. All of this testimony was material in jury determination of credibility of witnesses and the events surrounding disclosure, including corroboration of H.D.

    ii.    The forensic interviewer gave several false statements concerning H.D.'s description of Petitioner's penis, descriptions of sexual acts and H.D.'s opportunity to offer other possible suspects which is important because H.D.'s alleged disclosure was after coming directly from a convicted sex offender's home.

    iii.    The state court's determination of the facts that there was no perjury committed by Valerie Dyer is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 29-31.

**FACT 2: The perjury by Valerie Dyer masked Valerie's drug use, propensity to lie, manipulation of law enforcement to arrest Petitioner, motives to fabricate false charges, and coaching of H.D.**

**FACT 3: Valerie testified falsely to the events surrounding the date of disclosure, H.D.'s school attendance, and H.D.'s actions and statements during alleged disclosure.**

# Four: The District Court Failed to Require the Election of a Crime

**FACT 1: Petitioner was charged with sexually abusing H.D. from July 2009 – January 2010.** (See supporting brief Pgs.31-32 for argument and citation)

    i.    At trial the State introduced testimony by H.D. that she had been raped during the summer of 2009(T.399-100)(See also Attachment G and Video Transcript Pg. 24-35) as well as on January 2, 2010. The jury was given instruction to convict Petitioner if they believed the Petitioner had raped H.D. between July 2009 to January 3, 2010.

**FACT 2: The jury was charged to find the Petitioner guilty if they believed Petitioner had committed sexual acts on H.D. between July 2009 to January 3, 2010**

<u>FACT 3: Oklahoma law recognizes that rape is not a continuous act and that a conviction must be based on a single act, not any acts that might have occurred during a period of time, such as Petitioner was charged.</u>**. (See supporting brief Pgs.32 for argument and citation)**

<u>FACT 4: Oklahoma law allows prosecution of a parent based on any acts during a period of time, in child sexual abuse cases, when the parent has exclusive domination of said child.</u> **(See supporting brief Pgs.31-32 for argument and citation**

<u>FACT 5: Petitioner did not have exclusive domination of H.D. during the period of time in question</u>

i.    At trial the State introduced testimony by the alleged victim that she had been raped during the summer of 2009 as well as on January 2, 2010.

ii.    Petitioner testified that he lived in California from August-December 2009. Petitioner testified that he was in Oklahoma for only two (2) days during this time and did not see H.D. at all (T1.35-37)(T3.128). This is corroborated by Jan Dyer (T1.7-9) and Amanda (PH.72)(T2.13-15) and the state does not allege otherwise.

iii.    The state court's determination of the facts that Petitioner had exclusive domination of H.D. during the alleged crimes is objectively unreasonable in light of the evidence presented in the trial and post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 31-33.

iv.    Further, the court's failure to elect a crime allowed the Petitioner to be convicted in violation of federal law established in Estelle **(See supporting brief Pgs.32-33 for argument and citation)**

## Five: Prosecutorial Misconduct

<u>FACT 1: The prosecution mislead the jury about Valerie's motive to fabricate charges against Petitioner, her committing adultery, Petitioner's dedication to his family, and H.D.'s opportunity to name other suspects.</u> **(See supporting brief Pgs.35-36 for argument and citation)**

i.    The prosecution misstated evidence in an attempt to discredit the defense theory by misleading the jury into believing Valerie had no motive to fabricate the allegations while making inference that Petitioner was lying. During closing arguments, the prosecutor stated "...in July of 2009, Defendant shows up with his paperwork, divorce, visitation, custody, child support; it's worked out. There were no

issues. Valerie signed it". Further stating "There's no evidence of any issue with visitation, no issue with custody, no issue really going on at that point in time, July to sometime in August." and "Any evidence whatsoever that there's real issue going on with the divorce or custody at that point in time? No."(T3.183-184). However, in no way does this reflect the evidence as Valerie testified on direct that she wasn't OK with the divorce and custody agreement and didn't agree with it. The only reason she signed it was because the Petitioner threatened to "...take [H.D.] from me if I didn't and so I signed it so [H.D.] could live with me..." and "[Petitioner] would bring up the adultery and the drug use and—and I-I didn't want to lose my baby so I just signed the paper."(T3.59-60). The prosecutor also has knowledge that Valerie testified that she would "do anything including perjury" to keep Petitioner from gaining custody (T1.72). By Valerie's own admission, she gave petitioner problems with visitation (T3.145).

ii.     The Prosecutor argued in closing that Valerie is neither an adulterer nor a liar, stating: "Woman scorned? Where's the evidence? Drunken, drug abusing, affair-having liar? Where's the evidence? The only evidence that you have of—really any of that is the Defendant telling you that."(T3.185). Later stating "...affair-having liar? No evidence."(T3.190). However, Valerie was impeached three (3) separate times and the prosecution knew of at least ten (10) other instances of perjury[18] as well as the fact that Valerie admitted to committing adultery (T1.60)(T3.55,119)

iii.     During closing arguments, the State contended "...you heard Jessica say, 'has anyone else ever touched you like this? Anyone ever touch you in a way that's not okay?' She did, she asked that."(T3.216). This statement, while accurate on its face, is the regurgitation of perjured testimony. In the video interview, the only question ever asked of H.D. was "Has your dad done this to anyone else?".

iv.     On closing arguments, the State argued "Tell me one time [Petitioner] said, 'I felt a responsibility to my family. I felt a responsibility to my daughter.' When did he tell you that? He didn't. Not once.'(T3.190). This is a blatant and willful misstatement of the evidence as the Petitioner clearly testified that he had a responsibility not only to his Marines but to his family as well. Petitioner even further testified that these responsibilities conflicted (T3.116).

---

[18] See IAAC Sub Claim V (C) "Prosecutorial Misconduct" Pgs.43-50

v.    The state court's determination of the facts that the prosecutors did not mislead the jury about the evidence that was is objectively unreasonable and belied by the record as presented in the post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 35-36.

**FACT 2: The prosecution stated as uncontroverted fact that the Petitioner and his witnesses were lying, that H.D. was telling the absolute truth, that H.D. was definitely sexually abused, and that the Petitioner was definitely the abuser.** (See supporting brief Pg.36 for argument and citation)

i.    During closing arguments, the State improperly said that the Petitioner was lying by stating: "[Valerie] is a drunken, pill popping liar" and then "[this testimony] wasn't true. It didn't happen. It wasn't an issue."(T3.185-186).

ii.    The State blatantly said that in order to believe H.D. and Valerie were liars, you must believe H.D. wasn't abused. Further stating "[H.D.'s] not lying"(T3.215).

iii.    The State said that there "was no question, [H.D.] was sexually abused"(T3.188) in contradiction to the evidence presented by Dr. Waters (T1.21-22)(T3.144).

iv.    1The prosecutor said that the evidence that H.D. was sexually abused is "uncontroverted" (T3.190) in another contradiction to the testimony of Dr. Waters (T1.21-22)(T3.144).

v.    The prosecutor stated: "[H.D.] was sexually abused. She didn't fall down."(T3.215) when the evidence was not conclusive of abuse.

vi.    The Prosecutor stated "…it doesn't change the fact that [Petitioner] has sexually abused his daughter"(T3.212), relieving the jury of determining this "fact" for themselves.

vii.    The Prosecutor stated: "[Petitioner's] guilty of this, and I ask that you find him so."(T3.219)

viii.    The state court's determination of the facts that the prosecution did not make improper remarks is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 36-37

**FACT 3: The prosecution knowingly allowed witnesses to lie about events surrounding disclosure, Valerie's drug use, her willingness to lie and use law enforcement as a weapon against Petitioner, and mask Valerie's motive to fabricate charges.** (See supporting brief Pg.37 for argument and citation)

i.    Valerie Dyer testified that she picked up H.D. from Petitioner's home the night disclosure was made [Jan.3, 2010](T3.72). She further testified that she went to the police to report the abuse "the next day"[Jan.4, 2010](T3.84). However, police reports, affidavits, and prior testimony, prove that no police report was made until Jan.8, five (5) days after H.D. left Petitioner's home (See Attachment B at section (I)(A)). The State made no attempt to elicit the truth from its witness on this matter and was well aware that it was fabricated as the prosecutor was in possession of the evidence presented in Attachment B. This testimony is material as it proves that the alleged disclosure did not take place on the date or in the manner that was alleged.

ii.    Valerie testified that she hadn't discussed the sexual abuse with H.D. since disclosure(T3.91-92). However, the State recorded Valerie previously stating that H.D. gave "explicit" details to Valerie about the abuse and that Valerie "interviewed" H.D. numerous times. The State knew that this testimony was untrue as the recorded conversation was recorded by the State (See Attachment B-2). It was material as it proved that Valerie gave false testimony concerning her discussions with H.D. This mislead the jury into believing that Valerie hadn't spoken to H.D. about the alleged crime, increasing the credibility of H.D as well as removing Valerie as a possible perpetrator of coaching H.D. as she had no opportunity if no discussions took place.

iii.    Defense counsel attempted to show that Valerie wanted to be in a relationship with petitioner when she found out he was with Amanda [Dec. 2009], showing a motive for the anger to fabricate charges. Valerie testified "I didn't want to be with him, but I was still in love with him".(T3.139). However, the State recorded Valerie stating that she was "devastated" at learning Petitioner was with Amanda and emotionally says "I still wanted to be with you!" The State knew of this recorded statement as the State recorded it (See Attachment B-2). This false testimony is material as it mislead the jury into believing that Valerie would have no reason to press false charges because she wasn't angry at Petitioner for leaving her and she didn't even want to be in a relationship with her.

iv.     Valerie testified that she volunteered the information to Petitioner that she had committed adultery (T3.55). When asked if she denied the relationship to the Petitioner at first, Valerie answered "No"(T3.119). This is contrary to truth as Valerie previously testified that she denied it "maybe an hour"(T1.69). The same prosecutor was present during both testimonies and failed to correct it. This false testimony is material as it goes to Valerie's credibility and the jury's perception of her truthfulness. The jury's perception of her truthfulness is likely what the jury's decision relied upon.

v.     Valerie testified that she had "only did the drugs that one time and I told [Petitioner]."(T3.111). However, Valerie previously admitted to leaving H.D. at multiple residents while doing drugs (T1.33) and therefore must have used drugs multiple times. The same prosecutor was present for both testimonies and failed to elicit the truth. The defense theory was that Valerie was a drug addict that used her daughter to win a custody battle. The jury only hearing that Valerie used drugs once, undermined the defense's credibility with the jury and was taken into deliberation with them.

vi.     When the defense attempted to question Valerie about testimony she had never given before concerning disclosure about H.D. complaining of her Vagina burning and Valerie getting something to stop the burning, Valerie replied "I never said that". The defense tried to inquire but she states further "No, I said sit down in the bathtub and maybe it would stop hurting."(T3.75). The fact, however, is that Valerie had previously testified during direct that H.D. complained of her vagina burning and Valerie offered to get something for it: "...I'll—I'll get you something for it not burning(T3.75). This testimony was improvised by Valerie during direct examination and she had forgotten it by cross. The prosecution made no attempt to elicit the truth which did not bring to the attention of the jury that Valerie was making her testimony up "on the fly".

vii.     The defense attempted to proffer evidence concerning Valerie's uncle making unwanted sexual advances to her previously while the Petitioner was in the Marine Corps, causing Valerie to move into Petitioner's parent's home. She testified that she didn't move into the Dyer home and that she had no problems with her relatives (T3.149). During previous testimony, however, Valerie clearly testified that she did, in fact, move into the Dyer home and that the reason was that she was having problems at home

(T1.62). The State was aware of this false testimony and it completely hindered the defense in bringing forward information that Valerie had been molested by her uncle when she was a minor. This would be presented to the jury a reason that Valerie used the specific charge of child molestation to attack Petitioner as she had experienced it herself and knew what should be said from a child's standpoint in order to coach H.D. Further, it masked the fact that Valerie was attempting to make it appear as if Petitioner did not want her to have contact with her family when it was actually her own decision.

viii. Valerie testified that upon moving back to Oklahoma in Sep. 2008, Petitioner "wouldn't call very much" and never attempted to speak to H.D.(T3.48). At a previous trial, however, when asked this exact question by this exact prosecutor, Valerie testified that Petitioner called "all the time" and said nothing of his reluctance to speak to H.D. When asked "Did he talk and communicate with H.D. at this time?", she answered "Uh-huh—yes."(T2.62). This testimony was material as it mislead the jury into believing that the Petitioner had no emotional connection or care for his daughter and thus more likely to sexually abuse her.

ix. At trial, Valerie gave testimony concerning H.D.'s demeanor, statements, and actions on the alleged disclosure date, saying that H.D. was crying when she was picked up, that H.D. replied "I don't want to talk about it" numerous times when Valerie asked what was wrong, and that upon returning home, H.D.'s vagina looked red swollen and open(T3.72-76). Prior testimony proves this testimony perjured as Valerie testified that H.D. wasn't crying when she was picked up (DH.51)(T1.46), H.D. testified that Valerie never asked her if anything was wrong on the way home and never replied that she didn't want to talk about anything (T3.112); and when asked if she saw injury to H.D.'s vagina, Valerie previously stated "No, just irritation"(DH.19). The same prosecutors were present during the trial testimonies and failed to elicit the truth. This testimony is material as it corroborated the alleged crime by showing that H.D. was emotionally distressed coming directly from Petitioner's home the day after alleged abuse. Had the jury been made aware that Valerie was giving false testimony, there can be no doubt that they would have been less likely to believe the rest of Valerie's testimony and would not have accounted this testimony as corroboration of the interview and testimony of H.D.

x.      Valerie testified that in 2003, while living in TN., her marriage and Petitioner's treatment of her was bad because, "H.D. was in the way, [Petitioner] said, to do what he wanted to do".(T3.37). Previously, however, Valerie testified that the first time she ever heard a comment like this was in early 2009, six (6) years later (T1.29). The failure of the State to elicit the truth on this matter hid from the jury the fact that it was false testimony. This effected the jury's determination of credibility and allowed them to deliberate with the false impression that Petitioner felt no bond to his daughter but rather an annoyance.

xi.     Valerie testified that she never attempted to use law enforcement to have Petitioner arrested after the sexual abuse allegations (T3.147-148). This is blatant, provable perjury. Valerie, in fact, reported to the police that Petitioner was stalking her, vandalized her car twice, hijacked her e-mail, and had him wrongly arrested on a protective order violation, all while he was on bail for the sexual abuse charges[19]. The State had this information as well as a conversation that the State recorded June 30th, 2011 in which Valerie admitted to telling police that Petitioner slashed her tires but failed to tell the police when she learned that she had simply ran over something (See Attachment B-2). This testimony is material as it hid from the jury that Valerie had a history of using law enforcement to falsely attack Petitioner. That the State did not elicit the truth, alone, effected the jury's determination of credibility as it would have seriously diminished their trust in Valerie to learn she had blatantly lied to them under oath.

xii.    Valerie testified that Petitioner didn't want to go to Iraq a second time in 2008 and made Valerie tell his command that she was having problems with seizures. When asked if the reason was actually because of medical problems Valerie was having, she replied "No, sir"(T3.101). Once again, however, Valerie had previously testified to the opposite, stating that Petitioner was unable to deploy because Valerie was sick, having seizures, and was afraid to be alone with H.D., and that she requested the Petitioner stay home and help take care of H.D.(T2.56-57). This testimony allowed the jury to falsely

---

[19] (See Attachment B-8 for the police report alleging Petitioner stalked Valerie on May 24, 2010) (See Attachment B-9 for affidavits of Amanda Monsalve and Jan Dyer concerning Valerie's wrongful arrest and eventual release of Petitioner on September 22, 2010) (See Attachment B-10 for Police reports reflecting Valerie's attempts to have Petitioner arrested on May 14th and 16th, 2011 for vandalism as well as May 24th, 2011 for stalking)

believe that the Petitioner used his family to meet whatever purpose he might see fit as well as painting the Petitioner as a coward.

xiii.    Valerie testified that she never told Charles that she would lie if she had to in order to keep custody of H.D.(T3.149-150). However, when asked by the same prosecution at the first trial if Valerie told Petitioner she "would lie if [I] had to keep [H.D.]", Valerie replied "Yes" (T1.38). This is material because it removed from the jury's determination Valerie's untruthfulness and willingness to lie in court to win the custody battle against Petitioner.

xiv.    At trial, Valerie denied repeatedly that Petitioner was H.D.'s primary caregiver in Tennessee (T3.113-114). However, Valerie previously testified that Petitioner was, in fact, the primary caretaker at this time and admitted that she had mislead the jury of the first trial about this subject when she had denied it (T1.64). The State's failure to elicit the truth effected the jury's determination of Valerie's truthfulness and the fact that Petitioner did, in fact, assume the roles of a father, contrary to Valerie's assertion.

xv.    The State asked forensic interviewer, Jessica Taylor, if H.D. was able to describe Petitioner's "wiener" to which she replied, "Yes, she was."(T3.46). However, H.D. never described Petitioner's penis in any way during the forensic interview. The jury took this false testimony into deliberation and no doubt used it as corroboration because H.D. was able to specifically describe details about Petitioner's penis.

xvi.    Jessica Taylor stated: "[H.D.] talked about her dad would take spit from his mouth sand he would rub it onto his wiener before putting it inside of her bo-bo" and then reiterated again that her father did this to H.D.(T3.48). However, H.D. never made this statement as can be proven by reviewing the forensic interview. As argued in the previous paragraph, the jury took this false testimony into deliberation and no doubt used it as corroboration because H.D. was able to specifically describe details of a sexual act.

xvii.    Jessica Taylor states that she asked H.D. if anyone other than the Petitioner had abused her and H.D. answered "No". She states that this is part of the "alternative hypothesis" procedure and that H.D. was given the opportunity to answer this question (T3.55, 78-79). This is completely false testimony as Jessica never asks if anyone else had abused her and never offers opportunity to H.D. to verbalize an

"alternative hypothesis". The State knew this was false and its failure to elicit the truth allowed the jury to believe that H.D. was given ample opportunity to name a different suspect.

xviii.   The state court's determination of the facts that the prosecution did not knowingly allow witnesses to lie is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts as more fully set forth and established in the Br. Supp at pages 36-37.

## Six: The District Court Allowed Improper Hearsay

**FACT 1: H.D. was declared an "Unavailable" witness under Oklahoma law by the district court.** (See supporting brief Pg.39 for argument and citation)

i.   As the record reflects during Valerie's testimony (T3.77), the court allowed hearsay testimony because H.D. was ruled "Unavailable" as a witness under Oklahoma law.

**FACT 2: Under Oklahoma law, hearsay statements of a child under 13 years of age that have been declared "unavailable" may only be admitted if there is corroborative evidence of the act.** (See supporting brief Pgs.39 for argument and citation)

**FACT 3: Under Oklahoma law, the court is required to hold a hearing and state for the record the particular facts and circumstances supporting their findings that hearsay statements of children relating sexual abuse are reliable.** (See supporting brief Pgs.40-41 for argument and citation)

**FACT 4: Under Oklahoma law, these hearsay statements may not be admitted unless the particulars of the statements are made known to the defense 10 days in advance.** (See supporting brief Pg. 39-40 for argument and citation)

**FACT 5: H.D.'s hearsay testimony from Valerie Dyer was allowed over objection, though there is no corroboration and the statements were not made known to the defense prior to trial.**

i.   Over objection of the defense, Valerie was allowed to testify about comments made by H.D. to Valerie on the day of disclosure (T3.72-85). Valerie testified that (1) when Valerie asked what was wrong with H.D upon being picked up, she stated multiple times "I don't want to talk about it" and "I don't want to tell you" while H.D. was crying; when arriving home, H.D. supposedly gave these same answers again(T3.73-74), (2) H.D. was afraid of what her dad might do to her (T3.74-76), (3) H.D. kept complaining of her vagina hurting (T3.74-75), (4) H.D. didn't want her dad to find out that she disclosed (T3.75-76,79-80), (5) and was concerned Valerie had told others of the disclosure (T3.84).

ii.  The state court's determination of the facts that there was corroboration of the crime and that the statements were made known to the defense prior to trial is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts as more fully set forth and established in the Br. Supp at 42-43.

## FACT 6: The out of court forensic video was allowed without the specific findings of reliability or corroboration required by law. (See supporting brief Pgs.41 for argument and citation)

i.  The State of Oklahoma concedes that the Court made no specific findings as required by law[20].

ii.  The state court's determination of the facts that there were specific findings of reliability and corroboration of the crime is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts as more fully set forth and established in the Br. Supp at 40-43

## FACT 7: The testimony of forensic interviewer, Jessica Taylor, was allowed without specific findings of reliability, corroboration, or notice to the defense as required by law. (See supporting brief Pg.42 for argument and citation)

i.  Forensic interviewer Jessica Taylor testified to hearsay statements made to her during the video interview with H.D. The Court should not have allowed this testimony as it failed to make a record of particular facts and circumstances in which it found an indicia of reliability as required by law. Had it held a hearing, it would have found that there was no reliability in her testimony as she could not accurately recall what was said during the interview and gave perjured accounts of said interview. Specifically, Taylor testified that H.D. described the Petitioner's penis, that H.D. stated that Petitioner "would take spit from his mouth and he would rub it onto his wiener before putting it inside of her bo-bo", and that Taylor gave H.D. the opportunity to identify an alternate abuser by asking her if someone else touched her to which H.D. answered "no". However, all of this testimony is false as H.D. never said any of this. Additionally, the defense was never given notice of the specifics of her testimony so that it could prepare cross-examination.

---

[20] See *Dyer v State*, No. CF-2010-17 State's Response To Petitioner's Motion To Amend / Supplement Pleadings page 31 filed Oct. 14, 2014

ii.    The state court's determination of the facts that there were specific findings of reliability, corroboration of the crime, and notice to the defense is objectively unreasonable in light of the evidence in the record and presented to the post-conviction relief courts as more fully set forth and established in the Br. Supp at 41-43

## Seven: The District Court Erred in Not Sustaining Defendant's Demurrer (Sub Claim) (See supporting brief Pgs.43-45 for argument and citation)

**FACT 1: HD was unavailable as a witness and the forensic interview was improperly admitted at the first trial**

i.    At the trial in April 2011, the State presented its case in the form of testimony by Valerie Dyer, H.D., Jessica Taylor, Dr. Waters, and a video forensic interview. H.D. was unavailable as a witness due to her lack of memory of events (T1.12-16), and the inability for the defense to cross examine her. Under these circumstances, as per 12 O.S. 2803.1(A)(2)(b), the video forensic interview cannot be shown to the jury unless *"there is corroborative evidence of the act"*. Though there is no corroboration in this case, the video was still presented to the jury improperly. At the close of the State's case, the only properly admitted material evidence was the testimony of H.D. who denied that any abuse occurred at all. The Defense demurred to the evidence and the court denied the demurrer.

FACT 2: At the first trial, there was no evidence of a crime committed other than the improperly admitted video

i.    H.D. testified during the first trial that she didn't remember any sexual abuse ever occurring. Though the video interview was inadmissible without corroborating evidence, and none existed, it was played for the jury anyway.

**FACT 2: There was no proper evidence at the first trial on which to sustain any possible conviction, yet the court overruled the defense's demur, allowing for a 2nd and 3rd trial in which the state was able to shore up holes in their case by fabricating false testimony.**

i.    There was no evidence, properly admitted, that proved a crime had even occurred. However, the court denied the defense's demurrer to the evidence, allowing for a hung jury and 2 subsequent trials in

which the state was able to fabricate testimony to discredit the Petitioner and prohibit the jury from properly weighing the credibility of the witnesses. (See Attachments A &B, see also sub claims three and five)

**FACT 3: The facts and evidence presented by the state were identical at the third trial except that H.D. testified that she recalled the interview and testified that she was abused in a tent.**

j. If you did not exhaust your state remedies on Ground One, explain why: <u>Exhausted</u>

k. **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?  ☐ Yes  ☒ No

(2) If you did not raise this issue in your direct appeal, explain why: <u>This issue was not reviewable on Direct Appeal.</u>

l. **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court? ☒ Yes  ☐ No

(2) Type of motion or petition: <u>Application for Post-conviction relief under 22 O.S. §1080</u>

Name and location of the court where the motion or petition was filed: <u>Stephens County District Court, Duncan, Oklahoma.</u>

Docket or case number: <u>CF-2010-17</u>

Date of the court's decision: <u>October 22, 2014</u>

Result: <u>The District Court denied the application by summary order without reviewing the evidence or arguments presented by the Petitioner.</u>

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☒ No

(4) Did you appeal from the denial of your motion or petition?  ☒ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes", did you raise this issue in the appeal?  ☒ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes", State:

Name and location of the Court where the appeal was filed: <u>Oklahoma Court of Criminal Appeals, Oklahoma City, Oklahoma.</u>

Docket or case number: <u>PC-2015-512</u>

Date of court's decision: <u>November 19, 2015</u>

Result: <u>The District Court's denial was reversed on April 16, 2015 and remanded for further proceedings due to the fact that the lower court did not accept Petitioner's evidence as it should have when reviewing the application. The District Court denied the application once again and the Oklahoma Court of Criminal Appeals affirmed the denial.</u>

(7) If your answer to Question (d)(4) or Question (d)(5) is "No", explain why you did not raise this issue: <u>Not Applicable</u>

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: <u>Not Applicable</u>

GROUND TWO: <u>Petitioner's Trial Was Infected With Irrelevant, Unfair, and Prejudicial Character Evidence</u>

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim):

## FACT 1: Petitioner's trial was infected with a plethora of inadmissible evidence from the state to simply show that the Petitioner was a bad person deserving of punishment. (See supporting brief Pgs.45-47 for argument and citation)

(a)  <u>Throughout Valerie Dyer's testimony, Petitioner's character is attacked with numerous comments about his bad acts and vile treatment of his family. Valerie testified that Petitioner was angry about Valerie "bringing a child into this world"(T3.26), called H.D. "cancer in her stomach", punched Valerie in the stomach and was disgusted at Valerie's pregnancy (T3.25), was disgusted at Valerie's pregnancy (T3.25), faked being happy about having a baby when around others (T3.27,31,35), only rubbed Valerie's belly or talked to the baby once or twice during the pregnancy (T3.28), Petitioner refused to allow any of Valerie's family to come to the hospital during H.D.'s birth because he didn't allow Valerie's family access to the baby (T3.28-29),forced Valerie to move to TN. Because Petitioner was controlling and didn't want Valerie's family around H.D. (T3.29-30), refused to help with H.D., refused to hug or hold H.D., cussed Valerie (T3.31), was angry at Valerie for paying attention to H.D., neglected H.D. (T.3.32,38); Petitioner stated H.D. was in his way (T3.39,51-53); Petitioner had no interest in H.D., controlled Valerie and didn't want her around her family, grounded Valerie for a week from the phone in 2001 (T3.40,44-47), never called to speak to H.D. unless Valerie forced the issue (T3.48,52), and Petitioner was upset that Valerie moved out of his parent's home and refused to send money to she and H.D. to help (T3.13,50).</u>

(b)  <u>Petitioner contends that almost all of this testimony is inconsistent with prior statements and evidence, i.e. letters written by Valerie (See Attachment B-13 which shows that it was Valerie who did not like her own family, Petitioner was a loving husband, and Valerie felt she was not a good wife), Skype messages (See Attachment B-14 which prove that Valerie lied about Petitioner stating that H.D. was in his way and leaving Valerie stranded in Oklahoma), copies of bank statements (See Attachment B-</u>

7 which prove Valerie lied about Petitioner stranding her in Oklahoma with no money), and signed receipts of child support by Valerie (See Attachment B-6 which proves Valerie lied about Petitioner not helping financially). Also See Attachment B which proves that Valerie gave false testimony concerning many of these acts.

(b) If you did not exhaust your state remedies on Ground One, explain why: Exhausted

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☒ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: Not Applicable

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?   ☒ Yes   ☐ No

(2) Type of motion or petition: Application for Post-conviction relief under 22 O.S. §1080

Name and location of the court where the motion or petition was filed: Stephens County District Court, Duncan, Oklahoma.

Docket or case number: CF-2010-17

Date of the court's decision: October 22, 2014

Result: The District Court denied the application by summary order without reviewing the evidence or arguments presented by the Petitioner.

(3) Did you receive a hearing on your motion or petition?   ☐ Yes   ☒ No

(4) Did you appeal from the denial of your motion or petition?   ☒ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes", did you raise this issue in the appeal?   ☒ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes", State:

Name and location of the Court where the appeal was filed: Oklahoma Court of Criminal Appeals, Oklahoma City, Oklahoma.

Docket or case number: PC-2015-512

Date of court's decision: November 19, 2015

Result: The District Court's denial was reversed on April 16, 2015 and remanded for further proceedings due to the fact that the lower court did not accept Petitioner's evidence as it should have when reviewing the application. The District Court denied the application once again and the Oklahoma Court of Criminal Appeals affirmed the denial.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No", explain why you did not raise this issue: Not Applicable

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: Not Applicable

13. Please answer these additional questions about the petition you are filing:

    (a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☒ Yes ☐ No

    If your answer is "No", state which grounds have not been so presented and give your reason(s) for not presenting them: <u>Not Applicable</u>

    (b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reason for not presenting them: <u>No</u>

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? ☐ Yes ☒ No

15. Do you have any petition or appeal now pending in any court, either state or federal, for the judgment you are challenging? ☐ Yes ☒ No

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

    (a) At preliminary hearing: David Hammond (Address unknown)

    (b) At arraignment and plea David Hammond (Address unknown)

    (c) At trial: 1st trial David Hammond/ 2nd trial Albert Hoch/ 3rd trial Albert Hoch (Address unknown)

    (d) At sentencing: Albert Hoch (Address unknown)

    (e) On appeal: Robert Jackson (Address unknown)

    (f) In any post-conviction proceeding: N/A

    (g) On appeal from any ruling against you in a post-conviction proceeding: N/A

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ☐ Yes ☒ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. §2244(d) does not bar your petition. <u>Petitioner's 365 day time limit began on January 28, 2014 which was 90 days after direct appeal denial to the state's highest court. Petitioner had absolutely no access to a law library at this point and began requesting access but was denied repeatedly. On April 24, 2014 Petitioner was left with 278 days remaining and filed a crude Post-conviction application in order to stop the federal clock. On November 19, 2015 his Post-conviction proceedings became final, leaving him until Tuesday, August 23, 2016 until his federal tolling runs out. The Petitioner has been extremely diligent in</u>

pursuing his rights to appeal his conviction and is still within his one year limit considering tolling circumstances.

Therefore, Petitioner asks that the Court issue a writ of Habeas Corpus for his immediate release, remand to the state of Oklahoma for further proceedings, or any other relief to which petitioner may be entitled.

Charles Dyer, pro se petitioner
LCC Unit 5 H-2H
P.O. Box 260
Lexington, Oklahoma 73051

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on this _11_ day of _August_, 2016 to the following addresses:

Court Clerk
U.S. Courthouse
200 NW 4th St, Rm 1210
Oklahoma City, Oklahoma 73102

Signature of Petitioner